Richard W. DRAKE, Plaintiff–Appellee,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS, Kevin Wilson, Dr. William H. Whaley and West Paces Ferry Medical Clinic, Defendants–Appellants.

David J. Kuntz, Elsohly Laboratories, Inc., and Northwest Toxicology, Inc., Defendants.

Docket Nos. 05–0250–CV (L), 05–0252–CV (CON), 05–0560–CV(CON).

United States Court of Appeals, Second Circuit.

Argued: Dec. 2, 2005.

Decided: July 19, 2006.

Kevin McNulty, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C. (John J. Gibbons, Demestrios C. Batsides, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., Newark, NJ, D. Faye Caldwell, Caldwell & Clinton PLLC, Houston, TX, of counsel) Newark, NJ, for Defendants–Appellants Laboratory Corporation of America and Kevin Wilson.

Stephen F. Fink, Thompson & Knight LLP (Ira G. Rosenstein, Orrick, Herrington, & Suttcliffe, LLP, New York, NY, William H. Boice, Kilpatrick & Stockton LLP, Atlanta, GA, of counsel) Dallas, TX, for Defendants–Appellants William H. Whaley and West Paces Ferry Medical Clinic.

Samuel O. Maduegbuna, Maduegbuna Cooper, LLP (Kenechukwu C. Okoli, of counsel), New York, NY, for Plaintiff–Appellee Richard W. Drake.

Before CARDAMONE, LEVAL, and SACK, Circuit Judges.

SACK, Circuit Judge.

The plaintiff-appellee, Richard Drake, was terminated from his employment by Delta Air Lines in 1993 because airline officials thought he had failed a drug test required of him as an airline employee by federal law. Drake has asserted that some persons and entities involved in administering his drug test and disseminating the results violated the Fourth and Fourteenth Amendments to the United States Constitution and committed state common-law torts against him. Drake alleges, *inter alia,* that the defendants-appellants conducted the tests in violation of federal regulations and industry standards and that they falsely represented to Delta that Drake's urine sample was adulterated.[1]

The district court (Frederic Block, *Judge*) granted the defendants' motion to dismiss Drake's federal constitutional claims pursuant to Federal Rule of Civil Procedure 12(b)(6), but it declined to dismiss his state-law claims, concluding that they were not preempted by federal law. Some of the defendants, after certification by the district court and this Court pursuant to 28 U.S.C. § 1292(b), filed this interlocutory appeal.

The issues raised on appeal are whether and to what extent federal statutes and regulations concerning drug testing of persons employed in the aviation industry preempt the application of state tort law to

---

1. An "adulterated" specimen "contains a substance that is not expected to be present in human urine, or contains a substance expected to be present but [that] is at a concentration so high that it is not consistent with human urine." 49 C.F.R. § 40.3.

events arising out of such drug tests. We conclude that Drake's state tort claims are preempted to the extent that he asserts that the defendants-appellants violated state common-law drug-testing standards that are independent of federal law. But Drake's claims are not preempted insofar as he alleges that the defendants-appellants engaged in wrongful behavior not addressed by federal law, or insofar as his state-law causes of action do no more than provide remedies for violations of the federal regulations. Because none of Drake's asserted state-law causes of action appear from the pleadings to be based entirely on preempted state law, we affirm the order of the district court and remand the matter to that court for further proceedings.

## BACKGROUND

In 1993, after several decades as a flight attendant, Drake was terminated by his then-employer, Delta Air Lines, as a result of federally mandated drug testing he had undergone. Thereafter, but prior to filing this lawsuit, Drake brought three actions in federal court regarding his termination: one against Delta and two against the Federal Aviation Administration ("FAA"). The history of that litigation is recounted elsewhere. *See Drake v. Lab. Corp. of Am. Holdings,* 290 F.Supp.2d 352, 353–56 (E.D.N.Y.2003); *Drake v. FAA,* 291 F.3d 59, 63–66 (D.C.Cir.2002), *cert. denied,* 537 U.S. 1193, 123 S.Ct. 1295, 154 L.Ed.2d 1028 (2003); *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170 (2d Cir.1998) (per curiam).

### The Complaint

Drake filed this lawsuit, the fourth relating to his termination, in the United States District Court for the Eastern District of New York on December 28, 2001. Because the current appeal arises from a

motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we assume for purposes of this appeal that the allegations contained in the complaint are true. *See, e.g., Freedom Holdings Inc. v. Spitzer,* 357 F.3d 205, 208 (2d Cir.2004).

According to the complaint, Drake submitted a urine sample to Delta on October 28, 1993, as part of a federally required drug test. Both Drake and the Delta employee charged with collecting the sample signed a form affirming that Drake had not tampered with the sample. Delta divided the specimen between two vials, sending one to defendant-appellant Laboratory Corporation of America Holdings ("LabCorp") for testing.[2]

The complaint describes a complicated series of events following the urine collection, in which each of the defendants allegedly violated federal drug-testing protocols and thereby contributed to Delta's ultimate, erroneous conclusion that Drake's urine sample contained glutaraldehyde, "a substance often used to mask the presence of drugs in the body." *Drake v. FAA,* 291 F.3d at 63.[3] It is undisputed that the presence of glutaraldehyde, if validly detected, would have justified Drake's termination.

According to the complaint, LabCorp, after receiving Drake's urine specimen but prior to testing it, suspected that the specimen was adulterated based on its odor. One of LabCorp's employees allegedly notified Delta of these suspicions by telephone, in violation of federal regulations governing communications between drug-testing laboratories and aviation-industry employers. LabCorp subsequently attempted to test the specimen but found it "unsuitable for testing." Compl. at ¶ 42. LabCorp did not detect the presence of

---

**2.** The complaint does not make clear what Drake thinks happened to the other vial.

**3.** The complaint refers to glutaraldehyde as a controlled substance. *See* Compl. at ¶ 56.

glutaraldehyde or other drugs or adulterants. Having found the specimen unsuitable for testing, Drake alleges, LabCorp was required by federal law to cancel the test and destroy the sample, but it failed to do so. *Id.* at ¶ 43.

The complaint alleges that LabCorp continued to communicate directly with Delta regarding its suspicions about Drake's urine specimen, leading Delta management to think incorrectly that Drake had tested positive for drug use. It also asserts that LabCorp negligently sent some other employee's drug test results in place of Drake's to defendant-appellant William H. Whaley, who was the Medical Review Officer ("MRO")[4] for Delta and an owner and employee of defendant-appellant West Paces Ferry Medical Clinic. According to the complaint, LabCorp represented to Whaley that the other employee's test results were Drake's. *Id.* at ¶ 46. These results allegedly led Delta employees to believe that Drake's specimen had tested positive for a prohibited substance.

In the ensuing days, the complaint alleges, LabCorp failed to maintain records required by federal law regarding the chain of custody for Drake's urine specimen. It further alleges that LabCorp tampered with the sample. According to the complaint, on November 15, 1993, LabCorp sent "someone else's urine sample" to defendant Northwest Toxicology, Inc. ("Northwest"), and represented that the urine sample was obtained from Drake. *Id.* at ¶ 53. Northwest then tested the sample and "conveyed false results" to Delta. *Id.* at ¶ 54.[5] The complaint does not say what those false results were, but it does allege that Northwest tested the sample for glutaraldehyde and certified that glutaraldehyde was not found.

On November 19, Whaley sent a memo to Delta reporting his *"suspicions* of what *may* be in Drake's urine sample." *Id.* at ¶¶ 58–59 (emphasis in original). That day, Northwest sent the remainder of the sample to defendant ElSohly Laboratories, Inc. ("ElSohly") for testing, without maintaining proper custody over the specimen. ElSohly tested the sample on November 23, 1993. Although the sample tested negative, ElSohly "conveyed unsubstantiated and improper speculation about the sample to Delta and Whaley." *Id.* at ¶ 61.

On November 24, 1993, according to the complaint, Whaley sent another memo to Delta, which "acknowledged that no drugs or adulterants were found in Drake's alleged urine sample by any of the three labs (defendants LabCorp, Northwest and ElSohly), suggested that adulteration was still suspected, and warned that any further testing 'would violate' the [Department of Transportation] Drug Testing Regulations." *Id.* at ¶ 63. Nevertheless, on November 29, 1993, at Delta's direction and with Whaley's approval, Northwest "unlawfully purported to re-test Drake's alleged urine sample, and claimed that the re-test was positive for the presence of [g]lutaraldehyde." *Id.* at ¶ 64. According to the complaint, the November 29 re-test "had a number of anomalies," including that Northwest "had transferred all of the sample in its possession to ElSohly on November 19, 1993" and therefore did not have any of Drake's urine sample in its possession on November 29. *Id.* at ¶ 65. Whaley and Northwest accepted the re-

---

4. Federal regulations require aviation employers to appoint a licensed physician as an MRO to review drug test results on behalf of the employer. *See* 49 C.F.R. § 40.123; 14 C.F.R. pt. 121 App. I § I.

5. While it is not entirely clear from the complaint, presumably the sample tested by Northwest on November 15 is the same one that was sent to Northwest by LabCorp and that is alleged to be of someone else's urine.

sults of the November 29, 1993, re-test and transmitted the results to Delta.

Thereafter, Drake asserts, "Delta accepted the false and improper results ... in total disregard of all earlier tests that found no adulterant in Drake's alleged urine sample." *Id.* at ¶ 67. Delta suspended Drake on November 29, 1993, and terminated his employment on December 28.

### Drake's Claims

In his complaint, Drake asserts eight causes of action, contending that the defendants violated his rights under the United States Constitution and New York common law. In particular, Drake alleges violations of his rights under the Fourth and Fourteenth Amendments to the Constitution (Counts I and II), Negligence (Count III), Tortious Interference with Economic Relations (Count IV), Misrepresentation (Count V), Negligent Infliction of Emotional Distress (Count VI), Spoliation of Evidence (Count VII),[6] and Conspiracy (Count VIII).

Drake's central theory of negligence under New York state law is that while conducting Drake's drug test, the defendants repeatedly "ignored industry standards and protocols for random drug-tests" as well as federal drug-testing regulations prescribed by the Department of Health and Human Services, the Substance Abuse and Mental Health Services Administration, and the Department of Transportation ("DOT"). *Id.* at ¶ 89. Drake's other state common-law claims are also based on the defendants' alleged violation of industry standards and federal regulations pertaining to drug testing. Drake further alleges that the defendants violated New York common law by making false statements to Drake's employer.

### The District Court Opinion

The defendants moved to dismiss Drake's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion as to Drake's Fourth and Fourteenth Amendment claims. Drake does not appeal from that decision. The defendants moved to dismiss Drake's state-law claims on the ground that they were preempted by federal statutes and FAA regulations pertaining to the drug testing of aviation employees. The district court denied that motion, concluding that the statute and regulations did not preempt state common-law claims arising from allegedly wrongful drug testing.

In arriving at this conclusion, the district court noted that two circuits have addressed the preemptive effect of the FAA's drug-testing regulations, with conflicting results. In *Frank v. Delta Airlines Inc.*, 314 F.3d 195, 203 (5th Cir.2002), the Fifth Circuit concluded that federal drug-testing statutes and regulations preempted state common-law causes of action against an airline for faulty drug-testing procedures.[7] The Ninth Circuit reached a different conclusion in *Ishikawa v. Delta Airlines Inc.*, 343 F.3d 1129, 1132–34, *amended on denial of rehearing at* 350 F.3d 915 (9th Cir.2003), deciding that a plaintiff could bring suit against a drug-testing laboratory for the state common-law tort of negligence notwithstanding the FAA drug-testing regulations.

The district court examined the regulatory and legislative history of the federal drug-testing laws, "which neither *Frank*

---

**6.** Drake subsequently dropped his spoliation claim. *See Drake v. Lab. Corp. of Am. Holdings*, 323 F.Supp.2d 449, 455 n. 3 (E.D.N.Y. 2004).

**7.** The causes of action were negligence, intentional infliction of emotional distress, and defamation. *Frank*, 314 F.3d at 197.

nor *Ishikawa* has plumbed." *Drake v. Lab. Corp.*, 290 F.Supp.2d at 367. The court concluded that in drafting the express preemption provisions of the regulations and the statute, the FAA and Congress had been concerned primarily with state statutes prohibiting or limiting drug testing, not with state common law that might be applied to allegedly wrongful drug testing. In particular, the court noted that public comments relevant to preemption had focused on the possibility of state anti-drug-testing statutes, and that applicable DOT regulations prohibited waiver of the right to sue and referred at various points to the continued possibility of state lawsuits regarding drug testing. *Id.* at 367–69.

According to the district court, "the statutory and regulatory language, and their collective underlying purpose, compel the conclusion that neither the preemption provisions nor the FAA drug testing regulations were expressly or impliedly intended to preclude *any* common law tort claims." *Id.* at 373 (emphasis in original). The preemption provisions were "only intended to bar *positive state enactments.*" *Id.* (emphasis in original). Furthermore, the court concluded, even if "the preemption clauses could reach common law torts," Drake's state-law claims were not preempted because they were not "inconsistent with or covered by the subject matter of the drug testing regulations." *Id.* at 374.

*Subsequent Proceedings*

After ruling on the defendants' motion to dismiss, the district court decided to retain supplemental jurisdiction over Drake's state-law claims pursuant to 28 U.S.C. § 1367. The court also certified an interlocutory appeal on the preemption is-

sue to this Court pursuant to 28 U.S.C. § 1292(b).

We initially denied the defendants-appellants' applications to appeal under 28 U.S.C. § 1292(b), noting that the district court did not explicitly determine whether diversity jurisdiction existed over Drake's state-law claims or properly analyze whether supplemental jurisdiction was appropriate. *See Drake v. Lab. Corp. of Am. Holdings*, No. 04–0137 (2d Cir. May 5, 2004) (order denying applications to appeal). In a supplemental opinion, the district court concluded that diversity jurisdiction did exist. *See Drake v. Lab. Corp. of Am. Holdings*, 323 F.Supp.2d 449, 451–52 (E.D.N.Y.2004). The court also reaffirmed and more fully explained its decisions to retain supplemental jurisdiction over the case and to certify the preemption decision for interlocutory appeal. *Id.* at 452–56. On January 21, 2005, we granted the defendants-appellants' renewed applications to appeal.[8]

## DISCUSSION

The defendants-appellants argue that Drake's state-law claims are preempted by the Federal Aviation Act of 1958, Pub.L. No. 85–726, 72 Stat. 731 (codified as amended at 49 U.S.C. §§ 40101 *et seq.*) (the "FAAct"), by the Omnibus Transportation Employee Testing Act of 1991, Pub.L. No. 102–143, 105 Stat. 952 (1991) (codified in relevant part as amended at 49 U.S.C. §§ 45101 *et seq.*) (the "OTETA"), and by FAA regulations governing drug testing, 14 C.F.R. pt. 121, App. I. Their central contention is that federal law preempts all claims arising from the conduct of drug testing in the aviation industry and provides the exclusive remedies

---

**8.** Defendants Northwest, David J. Kuntz, and Elsohly Laboratories, Inc., have not joined in this appeal.

for any alleged wrongdoing that occurs during the course of such testing.

 The question of whether a federal statute preempts state law is "basically one of congressional intent." *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 30, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996); *see also In re WTC Disaster Site,* 414 F.3d 352, 371 (2d Cir. 2005) (similar). Similarly, whether federal regulations preempt state law depends on whether the agency that prescribed the regulations "meant to pre-empt [state] law, and, if so, whether that action is within the scope of the [agency's] delegated authority." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 154, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *see also Wachovia Bank, N.A. v. Burke,* 414 F.3d 305, 314 (2d Cir.2005) (similar), *pet. for cert. filed,* 74 U.S.L.W. 3233 (No. 05–431, Sept. 30, 2005).

We must determine whether Congress or the FAA intended to preempt the claims brought by Drake in this case.

## I. Standard of Review

We review de novo the district court's denial of the defendants-appellants' Rule 12(b)(6) motion to dismiss. *See, e.g., Toussie v. Powell,* 323 F.3d 178, 181 (2d Cir. 2003). The complaint cannot be dismissed under that rule "unless it appears beyond doubt, even when the complaint is liberally construed, that [Drake] can prove no set of facts which would entitle him to relief." *Allaire Corp. v. Okumus,* 433 F.3d 248, 250 (2d Cir.2006) (internal quotation marks and citation omitted). The district court's determination regarding preemption is a conclusion of law, and we therefore review it de novo. *See Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 107 (2d Cir.2001).

## II. Federal Law Governing the Drug Testing of Aviation Employees

In the FAAct, Congress granted the FAA broad authority over aviation safety, including the power to adopt regulations that it "finds necessary for safety in air commerce and national security." 49 U.S.C. § 44701(a)(5). Pursuant to this power, in 1988, the FAA promulgated regulations mandating that all aviation-industry employees who perform safety-sensitive functions be subjected to random drug-testing. *See* Anti–Drug Program for Personnel Engaged in Specified Aviation Activities, 53 Fed.Reg. 47024 (Nov. 21, 1988) (codified as amended at 14 C.F.R. pt. 121, App. I). The regulations set forth in great detail the "standards and components" that required drug-testing programs must include. *See* 14 C.F.R. pt. 121, App. I. They prescribe, among other things, the classes of employees that must be tested, 14 C.F.R. pt. 121, App. I § III, the substances for which they must be tested, *id.* § IV, the types of testing to be conducted (e.g., pre-employment testing, random testing, and post-accident testing), *id.* § V, and the length of time that records of required drug testing must be retained, *id.* § VI.

The FAA regulations incorporate by reference DOT regulations that set out detailed protocols to be followed by drug-testing laboratories. *See id.* § I.B. (requiring that aviation employers comply with "Procedures for Transportation Workplace Drug Testing Programs," 49 C.F.R. pt. 40, published by the DOT). The DOT regulations provide, among other things, that laboratories must use chain-of-custody procedures to document each time a urine specimen is handled or transferred, *see* 49 C.F.R. § 40.83(b), that an employer's designated MRO must review and certify test results before the laboratory reports them to the employer, id. § 40.97(b); id. § 40.123, and that laboratories must

report test results to an MRO in writing, id. § 40.97(b). Although they set out elaborate rules for conducting drug tests, the DOT regulations do not specifically address negligence on the part of drug-testing laboratories or otherwise establish the minimum standard of care to be exercised by laboratory personnel.

■ Neither the FAA nor the DOT drug-testing regulations provide for their own enforcement. Violations of the regulations, with respect to drug testing under the FAA's jurisdiction, are instead remedied by the general enforcement provisions of the FAAct. *See* 49 U.S.C. § 46101 (procedure for individuals or government officials to instigate investigation regarding violations of the FAAct or of regulations prescribed thereunder); *see also Drake v. FAA,* 291 F.3d at 70–71 (noting that Drake filed a complaint with the FAA pursuant to 49 U.S.C. § 46101 and concluding that the FAA's decision not to commence an enforcement action against Delta Air Lines was unreviewable). The remedies provided by the Act do not include a private right of action for violations of FAA regulations. *See Drake v. Delta Air Lines,* 147 F.3d at 170–71; *see also Schmeling v. NORDAM,* 97 F.3d 1336, 1344 (10th Cir. 1996).

In 1991, Congress enacted the OTETA, which mandated drug testing for a wide range of transportation workers. *See* Pub.L. No. 102–143, 105 Stat. 917, 952. The OTETA directed the FAA, specifically, to create a system of random drug-testing for aviation industry employees in safety-sensitive positions. *See id.* at 953–57 (codified as amended at 49 U.S.C. §§ 45101–07). Although the provisions of the OTETA relating to the FAA covered much of the same ground as the FAA's 1988 regulations, the statute did not supersede the rule. To the contrary, the statute expressly provided that it did not prevent the FAA "from continu[ing] in force,

amend[ing], or further supplement[ing]" preexisting regulations regarding drug testing. *Id.* at 956 (codified as amended at 49 U.S.C. § 45106(c)).

## III. Scope of Preemption

### A. The OTETA

The OTETA provides that "[a] State or local government may not prescribe, issue, or continue in effect a law, regulation, standard, or order that is inconsistent with regulations prescribed under this chapter." 49 U.S.C. § 45106(a). It also states that "a regulation prescribed under chapter does not preempt a State criminal law that imposes sanctions for reckless conduct leading to loss of life, injury, or damage to property." *Id.*

Because the OTETA allows the FAA to "continu[e] in effect" previous drug-testing regulations, the OTETA and the FAA's drug-testing regulations, including their respective preemption clauses, are simultaneously effective. Defendant-appellant Whaley argues that the OTETA's preemption clause is "seemingly more limited" than that of the FAA regulations, and that therefore "the proper focus" of our analysis should be those regulations. Whaley Br. at 10. We agree that the FAA regulations' preemption clause appears to be broader than that of the OTETA, and that the OTETA is therefore of limited independent significance to our preemption analysis. *Compare* 14 C.F.R. Pt. 121, App. I § XI(A) (stating that the FAA drug-testing regulations preempt state law "covering the subject matter" of the regulations) *with* 49 U.S.C. § 45106(a) (stating that state laws that are "inconsistent with" federal drug-testing regulations are preempted); *see also Frank,* 314 F.3d at 199 ("It is to [the FAA] regulations that one must turn in order to analyze the scope of preemption."). We therefore turn to consideration of the FAAct and the FAA regulations.

### B. The FAAct

As noted, many of Drake's state-law claims are based on the defendants' alleged violations of applicable federal regulations. Under federal law, Drake's limited remedies for violations of those regulations derive from the FAAct rather than from the regulations themselves. *See* 49 U.S.C. § 46101; *Drake v. FAA,* 291 F.3d at 69–70. The defendants-appellants argue that the remedial provisions of the FAAct are intended to provide the exclusive remedies for violations of the FAA regulations, and that Drake's attempts to seek state-law remedies for such violations are therefore preempted by the Act.

■ But the FAAct explicitly provides that "[a] remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120(c). The version of this clause in effect at the time of Drake's dismissal stated: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 49 U.S.C. Appx. § 1506 (1993).[9] This "saving" clause clearly indicates that the Act's remedies are not intended to be exclusive and that the Act therefore does not itself preempt Drake's claims for state-law remedies for violations of the FAA regulations. *See Abdullah v.*

American Airlines, Inc.,* 181 F.3d 363, 375 (3d Cir.1999) (concluding, based on the FAAct's saving clause, "that the traditional state and territorial law remedies continue to exist" for violations of federal regulations regarding aviation safety).

### C. The FAA Drug–Testing Regulations

The FAA drug-testing regulations expressly preempt "any state or local law, rule, regulation, order, or standard *covering the subject matter* of [this rule], including but not limited to, drug testing of aviation personnel performing safety-sensitive functions." 14 C.F.R Pt. 121, App. I § XI(A) (emphasis added). But they "do not preempt provisions of state criminal law that impose sanctions for reckless conduct of an individual that leads to actual loss of life, injury, or damage to property whether such provisions apply specifically to aviation employees or generally to the public." *Id.* § XI(B).

The defendants-appellants argue that the regulations are intended to preempt all state-law civil claims arising from the drug testing of aviation personnel, and thus all of Drake's claims. We disagree.

■ *1. Is Preemption Limited to "Positive State Enactments"?* As an initial matter, we disagree with the district court's conclusion that the preemption clause was "only intended to bar *positive state enactments*" such as statutes and

---

9. The parties agree that the relevant versions of the federal statutes and regulations at issue in this case are those that were in effect at the time of Drake's termination in 1993. Cf. *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 865, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) ("We, like the courts below and the parties, refer to the pre–1994 version of the statute throughout the opinion...."). Whether the current versions of the relevant federal statutes and regulations apply retroactively is in any event largely immaterial to our analysis, because there have been no subsequent substantive changes in the relevant preemption and sav-

ing clauses. *See* 49 U.S.C. § 45106(a) (no changes to preemption clause of OTETA since 1994); Pub.L. 103–272, 108 Stat. 745, 1224 (1994) (OTETA preemption clause revised slightly); H.R.Rep. No. 103–180, at 370 (1993) (explaining reasons for 1994 revisions to OTETA preemption clause); Pub.L. 103–272, 108 Stat 745, 1118 (1994) (saving clause of FAA revised without "substantive change"); 14 C.F.R. Pt. 121, App. I § XI (2006) (no substantive changes to preemption clause of FAA drug-testing regulations since 1993). We will cite to the current regulations except as otherwise noted.

regulations and was not "intended to preclude *any* common law tort claims." *Drake v. Lab. Corp.*, 290 F.Supp.2d at 373 (emphasis in original). The clause provides that the regulations preempt "any state or local law, rule, regulation, order, or standard covering the subject matter" of the regulations. 14 C.F.R. pt. 121, App. I § XI(A). We do not see why the drafters of the regulations would have used the words "rule," "order," and "standard" in addition to the words "law" and "regulation" if they meant to reach only "positive state enactments." It seems to us that the additional words were included to indicate that the regulations may preempt judge-made rules, orders, and standards, as well as statutes and administrative rules and regulations.[10]

As the Supreme Court has observed, however, the fact that federal law "may pre-empt judge-made rules, as well as statutes and regulations, says nothing about the *scope* of that pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443–44, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (emphasis in original). Under the terms of the preemption clause, state law (however made) is preempted by the FAA regulations only if it "cover[s] the subject matter of [the] rule." 14 C.F.R. Pt. 121, App. I § XI(A).

■ *2. The Scope of the Phrase "Covering the Subject Matter."* Upon adopting its drug-testing regulations in 1988, the FAA stated that "[t]he scope of the au-

thority preempted by this final rule and the authority reserved to the States is essentially identical to the provision in the regulations issued by the Federal Railroad Administration [('FRA')] (49 C.F.R. § 219.13)." 53 Fed.Reg. at 47048. The referenced FRA regulations, in turn, rely on the preemption clause of their enabling statute, the Federal Railroad Safety Act of 1970 ("FRSA"). *See* 49 C.F.R. § 219.13 (1988) ("Under section 205 of the Federal Railroad Safety Act of 1970 (45 U.S.C. § 434), issuance of these regulations preempts any State law, rule, regulation, order or standard covering the same subject matter. . . ."); 45 U.S.C. § 434 (1988) (providing that state laws relating to railroad safety could remain in effect until the Secretary of Transportation issued regulations "covering the subject matter of such State requirement"). The FAA thus stated that it intended the scope of its preemption clause to be "essentially identical" to FRA regulations that were drawn directly from the FRSA preemption clause. 53 Fed.Reg. at 47048.

In light of this regulatory history, we think that the Supreme Court's interpretation of the FRSA preemption clause sheds light on the meaning of the FAA regulations. *See CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); *Norfolk Southern Railway Co. v. Shanklin,* 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000).[11] In *Easterwood* and *Shanklin,* the Court con-

---

**10.** This conclusion is in line with recent Supreme Court decisions that have interpreted broad language in preemption clauses to reach state common-law claims. *See, e.g., Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 443, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) ("[T]he term 'requirements' . . . reaches beyond *positive enactments, such as* statutes and regulations, to embrace common-law duties."); *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 521, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("The phrase 'no requirement or prohibition' sweeps broadly and suggests no

distinction between positive enactments and common law . . . .") (alteration incorporated).

**11.** The point is not, of course, that the FAA specifically intended to incorporate the Supreme Court's case law regarding the FRSA into its preemption clause; that is impossible, because those cases were decided after the FAA adopted its regulations. The point is that the Supreme Court's reasoning in interpreting the FRSA applies as well to FAA regulations that were intended to be "essentially identical" to the FRSA.

sidered whether state wrongful-death actions arising from railroad accidents were preempted by regulations issued pursuant to the FRSA. Interpreting the phrase "covering the subject matter," the Court said:

> To prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they "touch upon" or "relate to" that subject matter, for "covering" is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law.

*Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732 (citation omitted); *see also Shanklin*, 529 U.S. at 352, 120 S.Ct. 1467 (citing *Easterwood*).

■ Although the FAA regulations at issue here also contain the phrase "covering the subject matter," the application of *Easterwood* and *Shanklin* to this case is not entirely straightforward. The FRSA states that *federal regulations* covering the subject matter of *state law* preempt that law, *see* 45 U.S.C. § 434 (1988 & Supp. II); 49 U.S.C. § 20106, while the FAA regulations provide that *state law* covering the subject matter of the *federal regulations* is preempted, *see* 14 C.F.R. Pt. 121, App. I § XI(A). In determining pre-emption, the question is ordinarily the scope of the federal government's intent to displace state law, not the scope of the state law that is displaced. It is one thing to say, as the Court did, that FRSA regulations preempt state law only when they "substantially subsume the subject matter of the relevant state law," *Easterwood*, 507

U.S. at 664, 113 S.Ct. 1732, and quite another to say that state laws are preempted only if they "substantially subsume" the subject matter of the FAA regulations.

But, whether it is state law that covers the subject matter of federal law or vice-versa, the Supreme Court has made clear that " 'covering' is a more restrictive term" than "touch[ing] upon" or "relat[ing] to." *Id.* We think that with the FAA regulations, as with the FRSA, proponents of preemption must establish more than some relationship between the areas of state and federal regulation in order to prevail. The intersection between the two must be substantial.[12]

*3. The "Subject Matter" of the Regulations.* The defendants-appellants acknowledge the relevance of *Easterwood* and *Shanklin* to this case, but they contend that the preemption clause of the FAA regulations is broader than that of the FRSA because the FAA regulations, unlike the FRSA, "expressly define[ ] the relevant 'subject matter.' " Whaley Br. at 13. The FAA regulations provide that state law is preempted when it covers the subject matter of the regulations, "including, but not limited to, drug testing of aviation personnel performing safety-sensitive functions." 14 C.F.R. pt. 121, App. I § XI(A). According to the defendants-appellants, the FAA thus defined the subject matter of its regulations as the "drug testing of aviation personnel" because it intended to preempt all state-law claims arising from such drug testing, not only those claims that overlapped with specific provisions of the regulations.

---

**12.** We note that in *Shanklin* the Supreme Court said: "[T]he language of the FRSA's pre-emption provision dictates that, to pre-empt state law, the federal regulation must 'cover' *the same subject matter*, and not merely ' "touch upon" or "relate to" that subject matter.' " *Shanklin*, 529 U.S. at 352, 120 S.Ct. 1467 (quoting *Easterwood*, 507 U.S. at 664,

113 S.Ct. 1732) (emphasis added). The Court thus seems to have thought that, for preemption to lie under the FRSA, both state and federal law must "cover" the same subject matter. This suggests that it is the *intersection* between federal and state law, not the breadth of the federal law, that determines whether state law is preempted.

We agree that some state laws covering the subject matter of the "drug testing of aviation personnel" may be preempted even if they regulate issues not specifically addressed by the FAA regulations. As noted, the FAA regulations establish a comprehensive "antidrug program" for aviation personnel. They lay out in considerable detail the steps that aviation-industry employers and (by reference to DOT regulations) drug-testing laboratories must take to carry out the program, from the selection of drugs to test for to the handling of test results. *See* 14 C.F.R. pt. 121, App. I; 49 C.F.R. pt. 40. Upon adopting the regulations, the FAA stated that it included a preemption clause in response to the recommendations of certain aviation-industry employers, who asked the agency to "proscribe[ ] State or local legislation that would interfere with the consistent and uniform testing and rehabilitation opportunities for aviation employees mandated by this final rule." *See* 53 Fed.Reg. at 47048. It seems to us that some state laws concerning drug testing—even if they address issues on which the FAA regulations are silent—may interfere with the "consistent and uniform" drug-testing program that the FAA intended.

In our view, however, state law does not *necessarily* "cover[ ] the subject matter" of the drug testing of aviation personnel whenever it is applied to events that occur during the course of such drug testing. On the contrary, the regulations clearly anticipate that some tort claims arising from regulated drug testing will be viable. The applicable DOT drug-testing protocols, expressly incorporated into the FAA regulations, *see* 14 C.F.R. pt. 121, App. I § I.B., provide that employees "may not be required to waive liability with respect to negligence on the part of any person participating in the collection, handling or analysis of the specimen or to indemnify any person for the negligence of others," 49 C.F.R. § 40.25(e)(22)(ii) (1993); *see also* 49 C.F.R. § 40.27 (employers may not require employees to waive liability in connection with DOT drug and alcohol testing program). As several courts have noted, that prohibition suggests that negligence claims may be brought.[13] *See Drake,* 290 F.Supp.2d at 373; *Ishikawa,* 343 F.3d at 1133; *Chapman v. Lab One,* 390 F.3d 620, 627 (8th Cir.2004); *cf. Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 868, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) ("The saving clause assumes that there are some significant number of common-law liability cases to save.").

As we have pointed out, moreover, upon adopting its drug-testing regulations, the FAA commented that their preemptive scope was "essentially identical" to regulations issued by the FRA. 53 Fed.Reg. at 47048. The FRA, when it adopted the regulations referenced by the FAA, stated that it did not intend to "require an employee to waive any claim for malpractice with respect to the drawing of blood or proper handling of the samples." *See*

**13.** The defendants-appellants seek to minimize the importance of the DOT's anti-waiver provision, pointing out that the DOT procedures apply to all DOT agencies, including some whose drug-testing regulations do not contain preemption clauses like the FAA's. The applicable DOT procedures do not, however, automatically cover the drug-testing programs of all DOT agencies (of which the FAA is one); they must be adopted "through regulations that reference [them] issued by agencies of the Department of Transportation." 49 C.F.R § 40.1 (1993). It was the FAA's affirmative decision to incorporate the DOT procedures, including their anti-waiver provision, into its own drug-testing regulations that gave rise to its applicability in FAA cases. The defendants-appellants' argument seems to be that this was simply an oversight on the part of the FAA. But this argument is supported only by speculation.

Control of Alcohol and Drug Use in Railroad Operations; Final Rule and Miscellaneous Amendments, 50 Fed.Reg. 31508, 31532 (Aug. 2, 1985).[14] Insofar as the scope of the FAA's preemption clause was intended to be "essentially identical" to the FRA's, the FAA regulations would also seem to be compatible with at least some such claims.

Based on these indications from the text and history of the FAA regulations, we do not think that they preclude all tort claims arising from regulated drug testing. We doubt, for example, that the regulations prevent an aviation-industry employee who slips and falls upon entering a urine collection site from bringing a suit in negligence, or that they immunize a urine collector from liability for all intentional torts he might commit while administering a drug test. It seems to us, rather, that state law "cover[s] the subject matter" of the drug testing of aviation personnel, and is therefore preempted, 14 C.F.R. pt. 121, App. I § XI(A), when it implicates the drug testing of aviation personnel in such a way that it interferes with the FAA's stated desire to regulate such drug testing in a "consistent and uniform" manner, 53 Fed. Reg. at 47048.

■ *4. The Regulations' Saving Clause.* The defendants-appellants argue, however, that the preemptive scope of the FAA regulations is broader than the regulations' preemption clause suggests. Relying on the Fifth Circuit's opinion in *Frank,* they contend that the saving clause of the FAA regulations, which provides that some state criminal statutes are not preempted, *see* 14 C.F.R. Pt. 121, App. I § XI(B), "impl[ies] that state law claims are otherwise broadly preempted," *Frank,* 314 F.3d at 200. They argue, in other words, that we must infer from the FAA's decision to save only certain state *criminal* laws that the agency intended to preempt all *civil* claims arising from FAA-regulated drug testing.

But although a narrow saving clause may in some contexts support an inference that preemption is otherwise broad, we do not think that such an inference is a strong one here. It is countered by persuasive evidence, discussed above, that the federal regulations are *not* intended to preempt all negligence claims arising from the drug testing of aviation personnel. In light of this evidence, we cannot conclude that the saving clause of the FAA regulations "carries a negative pregnant that other state law is preempted." *Ishikawa,* 343 F.3d at 1132; *see also id.* (rejecting similar argument with respect to the analogous saving clause of the OTETA).

### D. Conclusion as to the Scope of Preemption

■ Based on the foregoing analysis, we conclude that federal law governing the drug testing of aviation-industry employees has a narrower preemptive scope than the defendants-appellants contend. We agree with the defendants-appellants that the FAA drug-testing regulations are the proper focus of our preemption analysis,[15]

---

**14.** This comment was subsequently codified as an anti-waiver provision, similar to the DOT provision, that prohibits employers from requiring their employees to "waive liability with respect to negligence on the part of any person participating in the collection, handling or analysis of the specimen." · 49 C.F.R. § 219.11(d); *see also* Alcohol/Drug Regulations; Miscellaneous Amendments and Republication, 54 Fed.Reg. 53238, 53241 (Dec. 27, 1989) (noting that the new language was

designed to "make explicit" pre-existing policy).

**15.** One of the defendants-appellants, LabCorp, argues that even if no particular federal statutes or regulations expressly preempt all state-law claims arising from FAA-regulated drug testing, the comprehensive regulatory scheme of the FAAct and its accompanying regulations impliedly preempt such claims. But implied preemption would seem to be

and we recognize that those regulations describe a comprehensive drug-testing program. But the FAA regulations preempt only those state laws "covering the subject matter" of the FAA's drug-testing program, 14 C.F.R. Pt. 121, App. I § XI(A), not all laws "touch[ing] upon" or "relat[ing]" to it, *Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732.

▮▮▮ We think that the regulations call for a two-step analysis, then, for determining whether a state-law claim is preempted. First, state law is preempted if it "cover[s] the subject matter" of the federal rule. 14 C.F.R. Pt. 121, App. I § XI(A). When state law regulates conduct that is addressed by a specific provision of the FAA regulations, it is preempted. Second, state law is preempted if it "cover[s] the subject matter of . . . drug testing of aviation personnel performing safety-sensitive functions." *Id.* While some state laws may "cover the subject matter" of the drug testing of aviation personnel even if they regulate issues not specifically addressed by the FAA regulations, they are not preempted unless their relationship to such drug testing is so substantial as to interfere with the consistency and uniformity of the federal regulatory scheme.

## IV. Application to Drake's Claims

We think that the preemption analysis described above can only be conducted by examining the contours of the state "law, rule, regulation, order, or standard" in question and its relationship to the FAA's drug-testing program. 14 C.F.R. Pt. 121, App. I § XI(A). Because all of Drake's state-law claims are based on New York common law, we must consider his specific theories of recovery and determine whether the common-law rules and standards on which they rely are compatible with the federal regulatory scheme.

### A. State–Law Remedies for Violations of Federal Law

▮▮▮ In each of his state-law counts, Drake claims that he is entitled to relief under state law for the defendants-appellants' alleged violations of federal regulations. We have already concluded that the remedial provisions of the FAAct, the regulations' enabling statute, do not preempt such claims. *See supra*, Part III.B. But federal regulations may have preemptive effects that are broader than those of their enabling statutes so long as the preemption does not exceed the agency's delegated authority. *See de la Cuesta*, 458 U.S. at 154, 102 S.Ct. 3014. The defendants-appellants contend that Drake's claims for state-law remedies are preempted by the FAA drug-testing regulations because they "cover[ ] the subject matter" of those regulations. 14 C.F.R Pt. 121, App. I § XI(A).

▮▮▮ To be sure, any claim that the FAA regulations have been violated necessarily relates to the subject matter of the FAA regulations. But, as we understand Drake's claims, state common law plays no role in determining whether the defendants-appellants have breached the duties established by the federal regulations.

---

inconsistent with the FAAct's saving clause and with the FAA's apparent intent, discussed above, to allow aviation-industry employees to preserve some claims of negligence against drug-testing laboratories. Thus, we do not think that the implied preemptive effect of the federal regulatory scheme reaches any further than our analysis of the regulatory text indicates. *See Sprint Spectrum L.P. v. Mills*, 283

F.3d 404, 415 (2d Cir.2002) ("[W]here the federal statute contains 'a provision explicitly addressing preemption, and when that provision provides a reliable indicium of congressional intent with respect to state authority,' preemption is restricted to the terms of that provision." (quoting *Freightliner Corp.*, 514 U.S. at 288, 115 S.Ct. 1483) (alteration incorporated)).

The claim, instead, is that if such federal duties have been breached, there are state law causes of action for relief. If that is indeed Drake's claim, the subject matter covered, it seems to us, is not the substantive standards of the federal regulations, but the relief that is available for violations of those standards. But, as noted, the FAA drug-testing regulations are silent about remedies for their violation. Because remedies are not addressed by the FAA regulations, the state law under which Drake seeks remedies for violations of the regulations does not "cover the subject matter" of the regulations.

■ This conclusion is consistent with past interpretations of the FAAct and accompanying regulations. Other courts have recognized that, under the FAAct and other federal laws, the federal government's intent to preempt substantive state-law *standards* does not necessarily imply an intent to preempt state-law *remedies* for violations of federal standards. *See Abdullah*, 181 F.3d at 375 ("Even though we have found federal preemption of the standards of aviation safety, we still conclude that the traditional state and territorial law remedies continue to exist for violation of those standards."); *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 232–33, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) ("The [Airline Deregulation Act's] preemption clause, read together with the FAA[ct]'s savings clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated."); *cf. Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (concluding that state-law remedies for violations of Food & Drug Administration regulations regarding medical devices were not preempted because they "merely provide[d] another reason for manufacturers to comply with iden-

tical existing requirements under federal law" (internal quotation marks omitted)); *Riegel v. Medtronic*, 451 F.3d 104, 124 (2d Cir.2006) ("[T]ort claims that are premised on a manufacturer's deviation from the standards set forth in the device's [federally] approved [premarket approval] application ... are in no way preempted.").

State-law remedies do not in our view, moreover, "cover the subject matter" of drug testing in a way that would interfere with the operation of the federal regulatory system. The administrative remedies of the FAAct provide only for the FAA to issue an order of compliance, and bring suit to enforce it. They do not provide injured parties with any further redress, such as compensation for attendant harm to a individual who has been wronged by the failure to comply. *See* 49 U.S.C. § 46101(a)(4); *cf. Frank*, 314 F.3d at 201 n. 9. And the FAAct does not provide a private right of action for violations of FAA drug-testing regulations. *See Drake v. Delta Air Lines*, 147 F.3d at 170–71. "It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); *see also Lohr*, 518 U.S. at 487, 116 S.Ct. 2240 (plurality opinion) (same). And here, Congress has indeed commented on the matter, stating in the FAAct's saving clause that it does *not* intend for the Act to leave injured parties without remedy. 49 U.S.C. § 40120(c); 49 U.S.C. Appx. § 1506 (1993). When states provide remedies for violations of FAA regulations, they are in effect responding to the FAAct's express invitation to fill the gaps in its deliberately incomplete remedial scheme.

As for the FAA, its purpose in preempting state law covering the subject matter of its drug-testing regulations was to en-

sure that its drug-testing program could be administered in a "consistent and uniform" manner. 53 Fed.Reg. at 47048. It is difficult to see how state-law remedies for violation of the FAA regulations would detract from the uniformity of the program or interfere with its effective administration. *Cf. Lohr*, 518 U.S. at 495, 116 S.Ct. 2240 (state-law remedies "merely provide[d] another reason for manufacturers to comply with identical existing requirements under federal law" (internal quotation marks omitted)). In sum, we have been given no persuasive reason to conclude that federal law should be interpreted so as to deprive aggrieved employees of legal recourse against persons involved in the commercial enterprise of testing for drugs who would otherwise apparently enjoy immunity from liability despite their alleged failure to comply with federal law.

### B. Claims Based on Substantive State Common–Law Standards

We think, though, that some of Drake's allegations that the defendants violated substantive common-law standards of behavior may be incompatible with federal law.

■■■■ *1. Enlargements of Federal Requirements.* Although we have concluded that Drake may seek state-law remedies for violations of the federal regulations, we think that state law cannot "enlarg[e] or enhanc[e]" the regulations to impose burdens more onerous than those of the federal requirements on matters addressed by the federal regulations. *Wolens*, 513 U.S. at 233, 115 S.Ct. 817. Throughout his complaint, for example, Drake claims that the defendants' actions, in addition to violating applicable federal regulations, were "improper[ ]" and "wrongful[ ]." *E.g.*, Compl. ¶¶ 102, 113. If Drake is asserting that conduct addressed by the federal regulations is "wrongful" under state law although it does not vio-

late the federal regulations, such claims are preempted. Consistency and uniformity require that drug-testing laboratories be able to follow the requirements of the federal regulations exactly as they are written. A state-law enlargement or variation of any specific requirement of the regulations would interfere with the laboratories' ability to do so. It would be a state "law, rule, regulation, order, or standard covering the subject matter" of the FAA regulations and therefore be preempted. 14 C.F.R Pt. 121, App. I § XI(A).

■■■■ *2. "Industry Standards and Protocols."* Drake's claim that the defendants-appellants acted negligently by "ignor[ing] industry standards and protocols for random drug testing" also appears to be preempted to the extent that it refers to "standards and protocols" other than those in the federal regulations. Compl. at ¶ 89. The FAA and DOT regulations prescribe a comprehensive set of "standards and components" to be included in a federally regulated drug testing program. 14 C.F.R Pt. 121, App. I. State laws mandating additional or other standards and components for drug-testing programs—whether or not inconsistent with the federal requirements—would require aviation-industry employers and drug-testing laboratories to comply with two separate sets of procedures when carrying out FAA-regulated drug testing. This appears to be precisely the sort of burden that the FAA was seeking to avoid when it stated that state laws covering the subject matter of the "drug testing of aviation personnel" are preempted. *Id.* § XI(A).

■■■■ *3. Misrepresentation.* Drake's claim for misrepresentation, however, does not appear from the pleadings to be preempted, notwithstanding the fact that it is based on state-law standards of behavior rather than the standards set forth in the

federal regulations. At the time of Drake's termination, there was nothing in the FAA regulations concerning false statements made by drug-testing laboratories during the course of federally mandated testing.[16] Thus, the tort of misrepresentation regulates an issue on which the regulations are silent. It does not cover the subject matter of any specific federal requirement. And complying with common-law restrictions on misrepresentation would not seem to us to impose any special burdens on drug-testing laboratories that would interfere with the consistency and uniformity of the federal drug-testing program. We therefore do not think that Drake's misrepresentation claim covers the subject matter of "drug testing of aviation personnel" under the meaning of the FAA regulations. 14 C.F.R Pt. 121, App. I § XI(A).

### C. Disposition of the Appeal

"A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Todd v. Exxon Corp.*, 275 F.3d 191, 197–98 (2d Cir.2001) (internal quotation marks and citation omitted). Because we are confined to the allegations contained in Drake's complaint, "the precise contours of [his] theory of recovery have not yet been defined." *Lohr*, 518 U.S. at 495, 116 S.Ct. 2240. For those claims for which "preemption cannot be easily determined from the pleadings," *Abdu–Brisson v. Delta Airlines, Inc.*, 128 F.3d 77, 84 (2d Cir. 1997), our standard of review requires us to affirm the district court's decision to deny the defendants-appellants' motion to dismiss, with the understanding that the claims may ultimately prove to be preempted at a later stage of the litigation.

At present, none of Drake's five surviving state-law causes of action—negligence, tortious interference with economic relations, misrepresentation, negligent infliction of emotional distress, and conspiracy—appears to be foreclosed in its entirety. Each claim is based at least in part on the defendants-appellants' alleged violation of federal drug-testing regulations. As we have explained, state law may provide remedies for violations of federal standards so long as it does not impose substantive standards of its own in areas addressed by the federal regulations. On the other hand, certain subsidiary claims in Drake's complaint are incompatible with federal law to the extent that they seek to supplement the federal requirements with substantive state-law standards applicable to the same issue. And they are preempted insofar as they rely on state common-law procedures and protocols for drug testing.

Because, construing Drake's complaint liberally, none of his asserted state-law causes of action are based solely on preempted state law, the district court did not err in refusing to dismiss them at this time. On remand, however, and as the litigation proceeds, Drake will continue to be precluded from developing theories of recovery that are incompatible with the FAA's drug-testing program.

### CONCLUSION

For the foregoing reasons, the order of the district court denying the defendants-appellants' motion to dismiss is affirmed and the case is remanded for further proceedings.

---

16. A provision prohibiting false statements was added in 2004. *See* 14 C.F.R. Pt. 121, App. I § I.E.1 (2006); 69 Fed.Reg. 1840, 1855 (Jan. 12, 2004).